## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| SARA HIRST and DONALD HIRST on behalf of themselves and all others similarly situated, | ) ) ) | Case No.: |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WHIRLPOOL CORPORATION, | ) | **CLASS ACTION COMPLAINT** |
| | ) | **DEMAND FOR JURY TRIAL** |
| Defendant. | ) | |
| | ) | |

## CLASS ACTION COMPLAINT

Sara Hirst and spouse Donald Hirst ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Whirlpool Corporation ("Whirlpool" or "Defendant").  The following allegations are based upon personal knowledge as to Plaintiffs' own conduct, the investigation of counsel, and upon information and belief as to the acts of others.

## I.     SUMMARY OF CASE

1.      Plaintiffs Sara Hirst and Donald Hirst ("Plaintiffs" or "the Hirsts") represent a proposed class of thousands of consumers who owned and used residential electrical and gas laundry dryers designed, manufactured, and distributed by Whirlpool  including, but not limited to, its Cabrio and Duet models ("Class Dryers"), that are manufactured in a way that allows lint to collect and

build up in an area inaccessible to the consumer and adjacent to the dryer ignition source.  Removing the lint can only be done by disassembling the machine, vacuuming it out and cleaning the dryer drum.  The trapped lint is a fire hazard. The lint collection and ignition source described above is "the Defect".

2.     The seriousness of the health and safety hazards the Defect poses is exemplified by Plaintiffs' experiences, later described in detail, where the Defect could have been catastrophic: the Hirsts' home could have burned down and they and others, including their minor son, could have been injured or killed.  Other consumers' experiences are equally alarming and illustrate the degree to which the Class Dryers pose an unreasonable safety hazard.

3.     Whirlpool has known of the Defect and its dangers for years; however, to date, it has failed to recall the Class Dryers or to inform or alert the public that the Class Dryers are defective and pose a serious safety risk.

4.     Whirlpool's conduct violates well-established contract, tort, and consumer protection laws of Michigan and of other states, in addition to federal law.

5.     Plaintiffs bring this suit on behalf of themselves and other similarly-situated consumers.  They seek damages and appropriate equitable relief, including an order enjoining Whirlpool from selling or leasing the Class Dryers without disclosing the Defect to consumers.

## II.   PARTIES

7.     Plaintiffs Sara Hirst and Donald Hirst reside at 1650 Raisinville Road, Monroe, Michigan, 48161, in the County of Monroe.

8.     Defendant Whirlpool Corporation is a Delaware corporation that maintains its principal place of business at 2000 N. M-63, Benton Harbor, Berrien County, Michigan 49002-2692.

## III.   JURISDICTION AND VENUE

9.     This Court has original jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. §1332(d), because (a) at least one member of the proposed classes is a citizen of a state different from Whirlpool (b) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (c) the proposed class consists of more than 100 members, and (d) none of the exceptions under the subsection apply to this action.

10.     This Court has jurisdiction over Whirlpool because it is registered to conduct business in Michigan, maintains its headquarters in Michigan, has sufficient minimum contacts in Michigan, and otherwise intentionally avails itself of the markets within Michigan through the promotion, sale, marketing, and distribution of its products, such that exercise of jurisdiction by this Court is proper and necessary.

3

11.     Venue is proper in this District under 28 U.S.C. § 1391 because Whirlpool conducts substantial business in this District and a substantial part of Plaintiffs' claims occurred in this District.

### III.   SUBSTANTIVE ALLEGATIONS

**A.** The Whirlpool Corporation

12.     The Whirlpool Corporation is the leading major appliance manufacturer in the world.  According to its 2016 Annual Report, it earned $21 billion in annual sales for the year—a fifth year of record results for Whirlpool.  It employs 93,000 people, and operates 70 manufacturing and technology research centers. *See* http://assets.whirlpoolcorp.com/2016Annual/Whirlpool_2016_Annual-Report.pdf (website last visited June 5, 2017) (*See* Exhibit 1, attached).[1] Whirlpool markets a number of brands world-wide including Whirlpool, KitchenAid, Maytag, Consul, Brastemp, Amana, Bauknecht, Jenn-Air, and Indesit.   *See also* http://www.whirlpoolcorp.com/our-company (website last visited June 5, 2017) (Exhibit 2).

13.     The Whirlpool Corporation  manufactures, distributes, sells, and leases a variety of appliances including washing machines and dryers, refrigerators and freezers, microwave ovens, oven ranges, dishwashers, water filters, water heaters, water softeners, water filtration systems, furnaces, dehumidifiers, and air

---

[1] Hereinafter, website references will be designated by Exhibit number and each is attached to this Complaint.

purifiers/filters. *See* https://www.whirlpool.com/ (website last visited June 5, 2017)

( Exhibit 3).

14.    Whirlpool's current "Environment, Health and Safety Policy" states

the following:

> Whirlpool Corporation is committed to adopting responsible business activities that are consistent with our reputation for integrity and quality.  Accordingly **we are committed to protecting the health and safety of our** employees, **customer**s and other stakeholders. . . .

http://www.whirlpoolcorp.com/environment-health-and-safety-policy/     (website

last visited June 5, 2017) (Exhibit 4).

### B. The Whirlpool Dryer Defect

15.    The Class Dryers that Plaintiffs and Class Members purchased or

leased have a common Defect in their design and manufacture.

16.    Specifically, Whirlpool designed and manufactured the Class Dryers

that fail to seal the drum from the surrounding cabinet, thereby allowing the

accumulation of lint behind the drum and in the heater pan, areas that are not

visible to or serviceable by, the user.

17.    The accumulation of lint behind the drum and in the heater pan

represents a known and unreasonable fire hazard as it is reasonably foreseeable

that the Class Dryers' heat source will ignite the lint during normal use when the

Dryer is being used in the manner that it was intended to be used.

18.     In addition, some of the Class Dryers contain combustible plastic air ducts and flame shields further increasing the fire hazard risk.

19.     The Defect is particularly dangerous because it cannot be detected by the consumers during normal use as it exists in an area of the Dryer not visible to consumers.  As a consequence, at least some Class Members, as defined herein, have likely experienced one or more small fires in their Dryers that have gone undetected because the fire(s) did not result in larger fire(s).

20.     The Defect exists because Whirlpool failed to adequately design, manufacture, and test the Class Dryers to ensure they were free from the Defect at the time of sale and failed to remove the dangerously defective dryers from Plaintiffs' and Class Members' homes despite knowing of the Defect and the significant risk it posed to consumers and the public.

21.     The Defect, which is undetectable to the consumer, is manifest in the dryers when the dryers leave Whirlpool's possession and the Defect creates an immediate safety risk to consumers.

22.     This common Defect causes a serious safety risk that requires replacement to remedy.

23.     This common Defect also causes the Class Dryers to function improperly during the expected useful life of the dryer, resulting in fires like the

6

ones experienced by Plaintiffs as well as failures, repairs, and a significant risk of property damage, personal injury, and/or death.

24.     The Hirst dryer lasted only five years before having the first fire that Plaintiffs were aware of.  This failure, in addition to the extreme danger it posed, occurred well within what experts in the field have determined to be an average life expectancy for clothes dryers.

a.     Whirlpool U.S.'s own Senior Director of Top Load Laundry has stated that "Washers and dryers are designed and life tested to last 10 years, and the actual life can last 10 years."  *See* article Janeway, Kimberly, "How to Make Your Washer and Dryer Last:  Manufacturers Say You Should Get a Good 10 years Out of Your Laundry Appliances", *Consumer Reports*, February 4, 2106, page   6;   http://www.consumerreports.org/washing-machines/how-to-make-your-washer-and-dryer-last (website last visited June 5, 2017) (Exhibit 5).

b.     In its 2017 online publication, The International Association of Certified Home Inspectors lists a dryer's useful life at 13 years. *See* https://www.nachi.org/life-expectancy.html (website last visited June 5, 2017) (Exhibit 6).

c.     H&R Block lists the life expectancy of a dryer at 10-13 years. Fiol, Taryn, "The Life Expectancy of 7 Major Appliances", H&R Block Talk,

7

October 21, 2013; http://blogs.hrblock.com/2013/10/21/the-life-expectancy-of-7-major-appliances/ (website last visited June 5, 2017) (Exhibit 7).

        d.     In 2013, a Consumer Reports study concluded a dryer's life expectancy to be 13 years. *See* "By the Numbers:  How Long Will Your Appliances Last?  It Depends", *Consumer Reports News*, March 21, 2009; http://www.consumerreports.org/cro/news/2009/03/by-the-numbers-how-long-will-your-appliances-last-it-depends/index.htm (website last visited June 5, 2017) (Exhibit 8).

        e.     In its 2007 report, "Study of Life Expectancy of Home Components", the National Association of Home Builders reports dryers have a 13-year life expectancy. https://www.interstatebrick.com/sites/default/files/library/nahb20study20of20life20expectancy20of20home20components.pdf  (website  last visited  June 5, 2017). (Exhibit 9).

        f.     Sears, a seller of Whirlpool dryers, advertises that dryers typically last 10-13 years.https://www.searshomeservices.com/blog/how-long-do-appliances-usually-last; (website was last visited on June 5, 2017) (Exhibit 10).

    25.    Whirlpool owes a duty to Plaintiffs and others similarly situated to exercise reasonable prudence and ordinary care in the design, manufacture, testing, inspection, sale and distribution of its Dryers.

## C. Consumer Complaints Reveal the Magnitude of the Defect

The Consumer Products Safety Commission ("CPSC") has posted online reports of Whirlpool dryer fires where lint accumulation was either suspected or confirmed by the consumer.https://www.saferproducts.gov/Search/Result.aspx?b=whirlpool&cid=14350&dm=1&htid=9%2c14%2c30%2c31%2c34%2c39%2c47&pcid=10&srt=0; (Exhibit 11).

26.    Note that the CPSC did not start its searchable public database until March 2011.

### How did the Database come about?

In August 2008, Congress passed the Consumer Product Safety Improvement Act (CPSIA). Section 212 of the CPSIA requires the U.S. Consumer Product Safety Commission (CPSC) to create, by March 2011, a searchable public database of reports of harm (Reports) related to the use of consumer products and other products or substances within the jurisdiction of the CPSC. Congress required that the Database be publicly available, searchable, and accessible through the CPSC's website.

https://www.saferproducts.gov/FAQ.aspx   (website last visited June 6, 2017) (Exhibit 12).

27.    In addition, the CPSC provides consumer report of product incidents/defects to the manufacturers.

**About SaferProducts.gov**

**SaferProducts.gov** is the Publicly Available Consumer Product
Safety Information Database website of the U.S. Consumer Product
Safety Commission (CPSC).

**The U.S. Consumer Product Safety Commission** is charged with
protecting the public from unreasonable risks of injury or death from
thousands of types of consumer products under the agency's
jurisdiction. The CPSC is committed to protecting consumers and
families from products that pose a fire, electrical, chemical, or
mechanical hazard or can injure children. The CPSC's work to ensure
the safety of consumer products—such as toys, cribs, power tools,
cigarette lighters, and household chemicals—contributed significantly
to the decline in the rate of deaths and injuries associated with
consumer products over the past 30 years.

Through SaferProducts.gov, consumers, child service providers,
health care professionals, government officials and public safety
entities can submit reports of harm (Reports) involving consumer
products. Manufacturers (including importers) and private labelers
identified in Reports will receive a copy of the Report, and have the
opportunity to comment on them. Completed Reports and
manufacturer comments are published online at
www.SaferProducts.gov for anyone to search.  (Emphasis added.)

CPSC was required to create a public portal and a publicly accessible,
searchable database of consumer product incident reports by the
Consumer Product Safety Improvement Act (CPSIA), which became
law on August 14, 2008.

https://www.saferproducts.gov/About.aspx; (Exhibit 13).

28.    Attached hereto as Exhibit Nos. 14-38 are representative complaints

regarding Whirlpool dryer lint fires—caused by lint accumulation defects or

2:17-cv-12067-TGB-DRG   Doc # 1   Filed 06/26/17   Pg 11 of 68   Pg ID 11

suspect for lint accumulation defects—as reported to the U.S. Consumer Product

Safety Commission ("CPSC").  <u>Below is a table summarizing those complaints.</u>

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| 14 | https://www.saferproducts.gov/ViewIncident/1663734 | 5/15/17 | Duet | ". . . caught fire while running. . . "Lint had apparently gotten behind the drum and caught fire; melting the wires in my dryer. . . " |
| 15 | https://www.saferproducts.gov/ViewIncident/1624469 | 1/18/17 | Maytag Maxima | ". .. When I started to trouble shoot the dryer I found an excess of lint build up in the blower wheel.  Some  of the fins had a quarter inch on each fin. After each use we always clean the lint screen. However, the lint duct always has large amounts of lint, which we clean with the vacuum and brush.. . ." |
| 16 | https://www.saferproducts.gov/ViewIncident/1615926 | 12/18/16 | Duet | ". . . my wife was transferring a small load of towels into our dryer.. . . As I went into the room where it was, I could smell odor of burning plastic, and I immediately unplugged the unit. Smoke began to rise from top cover of unit. . . .I loosened the top cap and was immediately hit by a wall of smoke, from the burning circuitry. . . |
| 17 | https://www.saferproducts.gov/ViewIncident/1606949 | 11/9/16 | electric dryer | "Clothes dryer caught fire filling house with smoke and burned clothes that were in the dryer." |
| 18 | https://www.s | 10/7/16 | Cabrio | "The consumer stated that the |

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| | aferproducts.gov/ViewIncident/1599582 | | | dryer was in use.  It had been running for a couple of minutes.  The consumer stated that his wife went past the room where the product was located and smelled something burning.  She turned the dryer off. The consumer went into the room and saw smoke coming from the dryer.  He turned on the vent and called 911.  The fire department came out and check the lint trap and the line going out of the unit.  The line and the lint trap was clean.  The consumer was advised that it smelled electrical there was no fire.  The consumer called Best Buy to get warranty information.  The consumer called the warranty department. A dispatch was set up for a serviced company called Big Kountry.  The technician took the dryer apart and found lint under the drum of the dryer.  The entire bottom of the drum between the wall housing and the drum was black." |
| 19 | https://www.saferproducts.gov/ViewIncident/1596252 | 9/23/16 | ventless dryer with heat pump | ". .. The technician advised the consumer that the dryer had a lot of lint build up near the compress and engine.  The consumer was advised that this presents a fire hazard.  The technician contacted Whirlpool to inquire about repair |

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| | | | | methods and the technician was told this was a design and could not be repaired.. . . The consumer was also informed that page 11 in the manual states that the dryer should be cleaned every 2 years.  Hoever, the consumer believes the design poses a fire hazard and the dryer has been having this problem shortly after purchase. . . . " |
| 20 | https://www.saferproducts.gov/ViewIncident/1544883 | 1/9/16 | Duet | "Whirlpool duet ht caught fire. . . " |
| 21 | https://www.saferproducts.gov/ViewIncident/1396565 | 4/9/14 | Cabrio | ". . . lint inside my dyer caught fire while the dryer was operating.  Reason: Traditional dryers have the heating unit high up and vertical in the back of the unit. . . . the vertical design does not allow lint to collect on or above the heating unit.. . . My dryer's design has the heater underneath the unit with the air pulling through the underside of the the unit.  This is very unsafe as lint naturally collects at ground level. . . . This happened on our unit within only a year or two of use. . . . Upon inspection it as found that lint collected inside the bottom of the dryer caught fire." |

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| 22 | https://www.saferproducts.gov/ViewIncident/1386184 | 2/10/14 | gas dryer | ". . . flash fire within the dryer.. . . not a vent fire anomaly, but an apparent accumulation of fine lint and apparent feline hair. . . caused the incident in the dryer cabinet. . . ." |
| 23 | https://www.saferproducts.gov/ViewIncident/1382947 | 1/18/14 | Duet | ". . . while turned off, the dryer caught the clothes inside it on fire. . . .  The fire department was unable to extinguish the fire before it destroyed our house and possessions. . .  " |
| 24 | https://www.saferproducts.gov/ViewIncident/1340911 | 7/15/14 | Duet | ". . . Dryer over heats and clothes were to hot to touch." |
| 25 | https://www.saferproducts.gov/ViewIncident/1325548 | 5/6/13 | gas dryer | ". . . burning smell coming from the gas dryer. . . Upon inspection he off the back over and noticed a fair amount of charred lint.  He pulled off the front cover of the unit and also noticed a massive amount of lint build up on the bottom of the cabinet. . . " |
| 26 | https://www.saferproducts.gov/ViewIncident/1295145 | 1/8/13 | Cabrio | ". . . Removed bottom panel from my dryer and saw tons of black burnt lint covering the bottom of the burner compartment.  It evidently had a 'flash' fire. . . " |
| 27 | https://www.saferproducts.gov/ViewIncident/1291437 | 12/20/12 | not specified | "The clothes in our dryer ignited. The fire occurred in the clothes drum.  The limited lint in the vent pipe did not catch on fire.  If I did not have a fire extinguisher, it could have caused a house fire." |

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| 28 | https://www.saferproducts.gov/ViewIncident/1289621 | 12/10/12 | Cabrio | "I bought a Whirlpool dryer. . . it was delivered and installed on November 17, 2012.. . . On Dec. 8, 2012 at around 9 pm, we were doing laundry. . . Suddenly the fire alarm rang. . . I saw smoke came out of the dryer and it got so hot to touch. . . . . when everything calmed down, my husband found that the internal plastic parts melted.. . . " |
| 29 | https://www.saferproducts.gov/ViewIncident/1260850 | 7/20/12 | Duet | ". . . The entire drum was very hot. At thsi point we unplugged the dryer, but the burn mark continued to get bigger and it was clear that there was heat continuing to reach the drum. Eventually, we realized that we needed the shut off the gas.. . . gas leak. . . . no clogs in the vent. . . .″ |
| 30 | https://www.saferproducts.gov/ViewIncident/1224779 | 1/12/12 | Cabrio | ". .. our laundry room smelled very smokey, and near the dryer the odor was strong.. . . . after taking off the dront door, they removed the drum and the kick-plate to find the bottom of the dryer filled with burn lint. There had been a fire under the dryer.. . .. " |
| 31 | https://www.saferproducts.gov/ViewIncident/1209503 | 10/19/11 | electric dryer | ". . . After checking found the dryer had the clothes that were inside it burning. The dryer had malfunctioned and set the clothes on fire.. . .″ |

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| 32 | https://www.saferproducts.gov/ViewIncident/1207336 | 10/11/11 | electric dryer | ". .. About every 4 months the dryer stops drying clothes. We took the back off & then the cover off the event that covers the back where it blows lent out and you can reach down barely get in that area & there is a lot of lint pressed tightly in that small area.  I'm afraid this is going to cause a fire. . . ." |
| 33 | https://www.saferproducts.gov/ViewIncident/1207673 | 10/13/11 | Duet | "Electrical fire occurred in dryer wiring harness." |
| 34 | https://www.saferproducts.gov/ViewIncident/1203639 | 9/29/11 | electric dryer | "Dryer was extremely hot.  When I opened the door I saw the inside of the dryer was melting. A vent inside the dyer looked burnt. . . ." |
| 35 | https://www.saferproducts.gov/ViewIncident/1197229 | 8/17/11 | Maytag electric dryer | ". . . Tech informed hee that wires were burned up inside of drum & inside dryer as well as the insulating material around the drum. . . ." |
| 36 | https://www.saferproducts.gov/ViewIncident/1186770 | 6/10/11 | gas dryer | ". . . This lint buildup is approximately 40 days. . . . The two repair men from A & E Maintenance said this is normal and that the customer has to keep these 3 areas clean.  In order to clean the lint from underneath the lint filter, a plate has to be removed from inside the dryer. Two screws hold the |

| Exhibit No. | Report Web Address | Report Date | Whirlpool Model | Selected Text from Consumer's Report |
|---|---|---|---|---|
| | | | | plate in place.. . . The maintenance man agreed with me that this could become a fire hazard. . . ." |
| 37 | https://www.saferproducts.gov/ViewIncident/1182438 | 5/12/11 | Maytag Neptune | ". . . I opened the door there was a blash and bang like a loud pop. Electrical black smoke came from inside the drum and filled the room.. . ." |
| 38 | https://www.saferproducts.gov/ViewIncident/1179792 | 4/25/11 | Cabrio | "Dryer smelled like it was burning.  It stopped working so I had my husband take it apart.  There was burned lint all over the drum, the gas line and wires.  Lint collects on every internal part creating a fire hazard.  This time, all of the  lint collected on the lower internal floor had been burned and scorched giving the appearance of melted webbing all over the motor, wires, and the internal  gas components." |

29.    The following is an exemplar complaint from the CPSC's reporting website contained in Exhibit 31 above to this Complaint.

| | |
|---|---|
| Report Number | 20111019-1209503 |
| Product Description | electric clothes dryer |
| Date of Incident | 9/26/2011 |
| Report Date | 10/19/2011 |
| Sent to Manufacturer/Importer/Private Labeler | 12/19/2011 |
| Manufacturer/Importer/Private Labeler | Whirlpool Corporation |
| Brand Name | Whirlpool |
| Model Name or Number | Cabrio Hi-Efficiency// MLER |

|  | 36245Q1 |
| --- | --- |
| Serial Number | not listed |
| Manufacture Date | not listed |
| Retailer and State | not listed |
| Purchase Date | not listed |

Incident Description
UPON    ARRIVAL    FOUND    HOMEOWNER    AND    ALL
OCCUPANTS OUTSIDE THE HOME. THEY HAD TURNED OFF
THE
MAIN  BREAKER.  AFTER  CHECKING  FOUND  THE  DRYER
HAD  THE  CLOTHES  THAT  WERE  INSIDE  IT  BURNING.
THE DRYER HAD MALFUNCTIONED AND SET THE CLOTHES
ON    FIRE.    THE    DRYER    WAS    A    WHIRLPOOL
ELECTRIC        DRYER        MLER        36245Q1
DRYER WAS CARRIED OUTSIDE AND CLOTHES TAKEN OUT
AND EXTINGUISHED

https://www.saferproducts.gov/ViewIncident/1209503 (website last visited June 5,

2017) ( Exhibit 31).

30.    The following are representative complaints about Whirlpool dryers

taken    from    the    Consumer    Affairs    consumer    reviews'    website.

https://www.consumeraffairs.com/homeowners/whirlpool_washing_machine.html

(website last visited June 15, 2017) (Exhibit 39).[2]

♦Kimberly of Burleson, TX on Nov. 28, 2008

I purchased a Duet washer and dryer from Loews. The unit is less then
3 to 4 years old. The dryer has a defect , [sic] lint builds up on the
inside of the unit, if i had not been home it could have started a fire.
The  washer  leaves  my  cloths  smelling  like  mildew,  i  [sic]  have

---

[2] The Consumer Affairs' website was searched by inputting "Whirlpool" and
"dryer" in the SEARCH box and searching for lint fire complaints in the list of
consumer reports.

replaced the valves, the electric control (the brains of the unit), door lock, tubing, and water pump. The washer has leaked and has never cleaned my cloths. I'am [sic] out money and have been forced to purchase a new washer and dryer.

As a result of my bad choices, i have to replace my drywall, retile my wash room, replaced my kitchen and wash room floors, replace wood trim in my kitchen and washroom, and check for mold uild [sic] up in my house. I wish i [sic] had never purchased this piece of junk, it has cost me money and time, i will never ever purchase a whirlpool product again, even if they gie it me for free.

*Helpful?*YesNo

https://www.consumeraffairs.com/homeowners/whirlpool_washing_machine.html?

page=66 (website last visited June 6, 2017) ( Exhibit 40).

♦Christine of West Newton , PA on Sept. 24, 2015

*Satisfaction Rating*

I bought the washer and dryer. I had problems right away. The glass lid has broken and replaced 4x at the hingeless. [sic] YES 4 times – 1 time under warranty. I complain, they gave me 1 extra year of a warranty. Big deal... Was told it's not a recalled item because it didn't cause of fire. The dryer has caught fire 2x as the bottom fills up with lint. I messaged and sent picture and they did nothing. Said it was up to me to clean the unit. I am not able to take the dryer apart to clean it. The lint cannot be reached without removing the top and back of dryer and taking out the drum and the belt off.

Nothing but grief. Giant expense to maintain all the broken parts not to mention labor fees… Very very unsatisfied. And they do not care!!!! They will never get another penny of my money!!!!! I'm not sure how they get away with this!!! I spent $2000 to buy a good set that would last and all I got was junk. Not to mention the awful smell always having to bleach or cleaning it all the time.

*Helpful?*YesNo

https://www.consumeraffairs.com/homeowners/whirlpool_washing_machine.html?

page=16 (website last visited June 6, 2017) ( Exhibit 41, p.16).

♦Connie of West Carrollton, OH on Oct. 14, 2015

*Satisfaction Rating*
In September 2011, we purchased a Cabrio Washer and Dryer. Both appliances are extremely inferior. My first complaint to Whirlpool was in reference to the dryer. It kept overheating to the point that you couldn't even touch the clothes. In doing research I found this was a common problem and in some cases, even caused fires. After finding this out and contacting Whirlpool to complain and see if there were any recalls, they indicated they knew nothing about the problem and recalls would have to come from their legal department. I asked to speak with someone in that department and was told that was not possible. We threw the machine away and purchased a new no frills dryer. Now the washer has totally died. It would make noises, lockup, not spin, not clean, etc. Basically all the complaints other consumers have listed. It is now on the curb and I will again have a purchase a new washer.

The Whirlpool refrigerator I bought at the same time is a whole other story. Please do not buy Whirlpool. When contacted they show no empathy or concern about the inferiority of their products. There are only the 2 of us now and we do laundry one time a week. It amazes me how much money I am out between the initial purchases, repairs, and replacements. My daughter has also had the bad luck of purchasing Whirlpool appliances and is now experiencing the same problems.

Get the word out to all of your friends to NEVER purchase Whirlpool. They are apparently only concerned with their profits and not making good products or caring about their consumers problems. I made a very expensive mistake and will never purchase their products again. I have made them aware that I would be placing my review on your website along with the other 1,690 complaints. I have all my documentation re purchases, repairs, replacements and emails sent to Whirlpool. Unfortunately I cannot document all the calls made to this

company. Bottom line, I'm very disappointed in the products and the lack of concern. Please do not purchase.

https://www.consumeraffairs.com/homeowners/whirlpool_washing_machine.html?page=16 (website last visited June 6, 2017) (Exhibit 41, pp. 9-10).

### D. Whirlpool Recalled Tumbler Dryers in England and Ireland for the Defect

31.    In 2015, after numerous consumer complaints of fires in Indesit, Hotpoint, and Creda brand Whirlpool dryers manufactured in England and other European countries, Whirlpool issued the following statement on its Indesit and Hotpoint websites:

> In some rare cases, excess fluff can come into contact with the heating element and present a risk of fire.

*See* article:   Press Association, "Indesit and Hotpoint Issue Fire-Risk Warnings Over Tumble Dryers", *The Guardian*, November 23, 2015; https://www.theguardian.com/uk-news/2015/nov/24/indesit-and-hotpoint-issue-fire-risk-warnings-over-tumble-dryers (website last visited on June 6, 2017) (Exhibit 42).

32.    Whirlpool then instituted a program ". . .   contacting affected customers, who were warned not to leave their appliances unattended and to clean fluff from filter after each use." *Id* at page 1.

33.    On August 19, 2016, a fire caused by lint catching fire in an Indesit brand unit destroyed an 18-story apartment building in West London, England,

2:17-cv-12067-TGB-DRG   Doc # 1   Filed 06/26/17   Pg 22 of 68   Pg ID 22

causing 100 families to be evacuated and enlisting 120 firefighters to extinguish the blaze. *See* article Smithers, Rebecca/Consumer Affairs Correspondent, "Whirlpool Told to Do More to Ensure Safety After Tumbler Dryer Blaze", *The Guardian,* October 5, 2016. https://www.theguardian.com/money/2016/oct/06/whirlpool-told-to-do-more-to-ensure-safety-after-tumble-dryer-blaze (website last visited on June 5, 2017) (Exhibit 43). *See also* article: Telegraph Reporters, "Faulty Tumble Dryers that Caused Huge Tower Block Fire Still 'Putting Lives at Risk,'" The Telegraph, December 4, 2016. http://www.telegraph.co.uk/news/2016/12/04/faulty-tumble-dryers-caused-huge-tower-block-fire-still-putting/ (website last visited June 5, 2017) (Exhibit 44).

34.     In 2017, after a great deal of pressure from the U.K, Whirlpool finally admitted that millions of the tumble dryers posed a fire risk and instituted a recall in England and Ireland—this action after a year of Whirlpool maintaining that the dryers were safe. *See* article: Smith, Geoffrey, "Whirlpool Admits Its Tumble Dryers are a Fire Risk", *Fortune.Com*, February 22, 2017., http://fortune.com/2017/02/22/whirlpool-admits-its-tumble-dryers-are-a-fire-risk/ (website last visited June 6, 2017) (Exhibit 45). In this same article, *The Sun* newspaper is cited as reporting that the dryers were linked to 750 fires since 2004. *Id.* at page 2.

**E. Appliance Industry Has Had Knowledge of the Prevalence of Defect/Dryer Lint Fires**

35.    A 2012 Consumer Reports article regarding appliance fires references the following:

> **Dryers**
> Approximately 7,000 fires, 200 injuries, and 10 deaths are attributed each year to dryer fires, according to CPSC estimates.  A new voluntary standard that takes effect in March 2013 will require that fires starting inside the tumbler or base of the chassis be contained within the dryer.  Industry should now address one of the biggest causes of dryer fires:  the ignition of accumulated lint.  A 2011 study by the CPSC concluded that status indicators, akin to the "check engine" lights on automobiles, could be a reminder to empty lint filters and alert consumers to mechanical failures.  Although the results of our tests with standard-equipment lint detectors were inconsistent, an aftermarket system we reported on in 2011 worked.

*See* "Appliance Fires Pose a Safety Concern:  Millions of Dishwashers, Fridges, and Ranges, and More Are on Recall Lists", *Consumer Reports*, March 2012, pages  4-5.     http://www.consumerreports.org/cro/magazine/2012/03/appliance-fires-is-your-home-safe/index.html (website last visited June 5, 2017) (Exhibit 46).

**F.  Whirlpool Refuses to Warn Customers**

36.    Despite the high number of complaints and the danger posed by the defect, Whirlpool continues to conceal its existence from current customers and potential customers alike.   Whirlpool has not warned consumers at the point of sale.

37.     Whirlpool continues to conceal the defect even though it knows that the defect is not reasonably discoverable by customers unless they experience the defect first hand and are thus exposed to the attendant safety risks.

38.     Whirlpool remains silent even as it continues to receive complaints from frightened customers.

39.     As a result of Whirlpool's inaction and silence, many customers are unaware that they purchased a dryer which poses a fire hazard and which is unsuitable for its purpose to effectively dry laundry from the point of sale. Whirlpool knows of the defect yet continues to profit from the sale of dryers to unwitting consumers.

40.     Not only has Whirlpool concealed its knowledge of the Defect from the public, but it also conceived and executed a strategy to purportedly place "instructions" in some of its user guides that have no engineering basis and exist solely to provide a means to blame consumers for fires or other malfunctions in the Dryers resulting from the Defect. For example, Plaintiffs' "Whirlpool Cabrio Electronic Dryer Use & Care Guide contains the following instructions.

Removing Accumulated Lint
From Inside the Dryer Cabinet
Lint should be removed every 2 years, or more often, depending on dryer usage. Cleaning should be done by a qualified person.

This "instruction" is nothing more than part of Whirlpool's strategy to conceal the Defect from customers, shift the blame, and avoid liability for damages caused by its defective Dryers. *See* Exhibit 47, attached:   Hirts' "Whirlpool Cabrio Electronic Dryer Use & Care Guide," page 10.

## V.   **PLAINTIFFS' EXPERIENCE**

41.    On or about March 22, 2011 Plaintiffs purchased a Whirlpool Cabrio Gas Dryer, Model No: WGD7300XW0, Serial No: M04211786 from Durocher's in Monroe, Michigan.   The Hirsts paid $727.00 for the dryer.    Below is a photograph of the Hirsts' Cabrio washer and dryer set.



42.     The Hirsts purchased the dryer believing that it was properly designed, manufactured, and safe to use in their home.

43.     The Hirsts did extensive online research to find a washer and dryer that would be energy efficient.  They believed in "*going green*" and reviewed online ads from Whirlpool and other manufacturers. They had extensive conversations with a Durocher's sales representative before choosing the Cabrio gas dryer.  Sara Hirst was impressed with the various dryer settings for more efficient drying, including delicate clothes.  The marketing assured that the dryer had features that avoided over-drying clothes, and that it monitored heat with its

multiple dryer setting options and moisture sensing technology.   These
representations were made to the Hirsts by Whirlpool regarding their Class Dryer's
capabilities—statements that the Hirsts relied upon in choosing that particular
Dryer.

44.    On or about March 25, 2011 the dryer was installed by an installation
technician from Durocher's.

45.    Sara Hirst is the primary user of the dryer and it has always been her
practice to clean the lint screen with every use, often stopping the dryer during the
cycle to clean it before finishing the cycle.

46.    On or about June 2, 2016, a fire started in the dryer while a load of
laundry was in cycle.   Ms. Hirst smelled smoke, so she went to the basement,
stopped the cycle, opened the dryer, cleaned the lint screen and re-started the cycle,
not knowing at that time that there had been a fire.   The smell returned and was
worse, so Donald Hirst took apart the dryer and found a layer of burnt, blackened
lint on the dryer floor.   He then cleaned the dryer floor and surrounding areas, and
all dirty parts, and—for good measure—blew out the air duct, before reassembling
the unit.   Sara Hirst was able to clean the damaged laundry by rewashing it a few
times.

47.    Below are photos of the dryer following this lint fire:

**Bottom Left Side of Dryer/Disassembled After June 2, 2016 Fire**



**Interior of Dryer After June 2, 2016 Fire**



48.     Just four months later, on October 17, 2016, a larger fire began in the dryer.   Sara Hirst stopped the cycle, ceased using the dryer and contacted Whirlpool. Donald Hirst, who is a contractor by trade, disassembled the machine and found some wet lint packed in the metal corrugated funnel and burnt lint in the dryer cabinet.   He cleared the lint from that funnel that rests under the drum and the cabinet.   The lint should have not accumulated, especially just four months after the last fire, and should have been blown out of the vent.   Sara Hirst was able to clean the damaged laundry by rewashing it several times.

49.     Below are photos of the dryer from this fire:

**Bottom Right Side of Dryer/Disassembled After October 17, 2016 Fire**



**Bottom of Left Side of Dryer/Disassembled After October 21, 2016 Fire Exposed From Lint Duct Work/Screen Under Drum to Dryer Back and Vent After October 17, 2016 Fire**





**Dryer Interior**



**Igniter with Plastic Cover**



| **Igniter with Plastic Cover** |
| --- |
|  |

50.    Ms. Hirst contacted Whirlpool after the October 17, 2016 fire requesting a technician's help.  On October 28, 2016, Whirlpool sent one of their designated technicians—a service representative with Ace Appliance Service—to inspect the Hirst dryer. With Donald Hirst present, the technician determined that a lint fire had occurred; he told Mr. Hirst that the dryer was "clean", but when the technician took the drum out, there was an accumulation of lint where the ignition starts, there was charring on the drum, and there was a burn to the plastic fire shield.  The technician found where the lint had burnt the cabinet and burn marks on the plastic fire shield and drum.  On the invoice, the technician wrote: "Lint heat event.  Cleared lint from unit and ran test.  No issues found.  No gas leak found. Vent is long."  (*See* Exhibit 48, Ace Appliance Invoice, attached.)

| Disassembled Dryer During Technician Visit |
| :---: |
|  |

51.     Because it is now clear to the Hirsts that their Cabrio dryer poses an ongoing lint fire danger, Donald Hirst disassembles, vacuums, and cleans it out bi-weekly.  The process takes approximately one hour.  The dryer is never turned on when the Hirsts are not at home.  At this time they cannot afford to buy a different dryer.

52.     Sarah Hirst contacted Whirlpool to request a refund for the dryer.  The Whirlpool representative with whom she spoke said that the technician determined

that the fire was caused by the vent being too long.  Ms. Hirst explained that the vent was well within the limits of Whirlpool's installation guidelines.  Whirlpool responded by saying that they would haul away the dryer and pay the Hirsts $350, which the Hirsts declined, requesting that Whirlpool change its practices to inform the public of the dangers of the machine and provide them with a full refund for their Cabrio dryer.  Whirlpool declined.

53.    Had Whirlpool adequately disclosed the Defect at the point of sale, Sara and Donald Hirst would not have purchased the dryer at issue, would have paid substantially less for the dryer, or would have purchased a less expensive dryer.  They did not receive the benefit of their bargain.

## VI.    CLASS ACTION ALLEGATIONS

54.    Pursuant to Fed. R. Civ. P. 23, Plaintiffs bring this case as a class action on behalf of themselves and all others similarly situated as members of the following proposed Nationwide Class and Michigan State Class (collectively, "the Classes"), on their federal and state claims as purchasers and lessees of  the Class Dryers.

### The Nationwide Class:

*During the fullest period allowed by law, all persons and entities residing in the United States, including its territories, who purchased or otherwise*

*acquired the Class Dryer, designed and/or manufactured by Whirlpool primarily for personal, family, or household purposes and not for resale.*

**The Michigan Class:**

*During the fullest period allowed by law, all persons and entities residing in the State of Michigan  who purchased or otherwise acquired the Class Dryer, designed and/or manufactured by Whirlpool primarily for personal, family, or household purposes and not for resale.*

55.     Excluded from the proposed class is Whirlpool; any affiliate, parent, or subsidiary of Whirlpool; any entity in which Whirlpool has a controlling interest; any officer, director, or employee of Whirlpool; any successor or assign of Whirlpool; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse; and members of the judge's staff; and anyone who purchased a Class Dryer for the purpose of resale.

56.     Members of the proposed class are readily ascertainable because the class definition is based upon objective criteria.

57.     **Numerosity.**  Whirlpool sold thousands of the Class Dryers, including a substantial number in Michigan.  Members of the proposed classes likely number in the thousands and are thus too numerous to practically join in a single action. Class Members may be notified of the pendency of this action by e-mail and mail,

supplemented by published notice (if deemed necessary or appropriate by the Court).

58. **Commonality and Predominance.**  Common questions of law and fact exist as to all proposed Class Members and predominate over questions affecting only individual Class Members.   These common questions include:

a. Whether the Class Dryers designed, manufactured, and sold by Whirlpool pose safety risks to consumers;

b. Whether Whirlpool knew, or should have known, that the products it sold into the stream of commerce pose unreasonable safety risks to consumers;

c. Whether Whirlpool concealed safety risks the Class Dryers pose to consumers;

d. Whether safety risks the Class Dryers pose to consumers constitute material facts that the reasonable purchasers would have considered in deciding whether to purchase a clothes dryer;

e. Whether the Class Dryers designed, manufactured, and sold by Whirlpool possess material defects;

f. Whether the Defect in the Class Dryers represents and unreasonable risk that a fire will occur or that, once it has occurred,  will spread outside the Dryer cabinet;

g. Whether Whirlpool knew, or should have known, that the Class Dryers possessed the Defect when it placed the Dryers into the stream of commerce;

h. Whether Whirlpool concealed the Defect from consumers;

i. Whether the existence of the Defect is a material fact reasonable purchasers would have considered in deciding whether to purchase the Class Dryer;

j. Whether the Class Dryers are of merchantable quality;

k. Whether the Class Dryers are likely to pose serious safety risks to consumers before the end of the Dryers' reasonable expected lifetimes;

l. Whether the Class Dryers are likely to start on fire or fail before the end of their reasonable expected lifetime;

m. Whether the Class Dryers are defectively designed to allow fires to spread outside of the Dryer itself creating a serious risk of injury, death, and/or property damage;

n. Whether the Class Dryers' Defect resulted from Whirlpool's negligence;

o. Whether Whirlpool breached express warranties relating to the Class Dryers by failing to recall, replace, repair, and/or correct the Defect in the Dryers;

p. Whether Whirlpool breached the implied warranty of merchantability implied in every sale of goods;

q. Whether Whirlpool misrepresented the characteristics, qualities, and capabilities of the Class Dryers;

r. Whether Whirlpool either knew or should have known of the Defect prior to  marketing and selling or leasing the Class Dryers to Plaintiffs and Class Members;

s. Whether Whirlpool omitted, concealed from and/or failed to disclose in its communications and disclosures to Plaintiffs and Class Members material information regarding the Defect at the point of sale and beyond;

t. Whether Whirlpool omitted, concealed from and/or failed to disclose in its communications and disclosures to Plaintiffs and Class Members material information regarding the Class Dryers' safety issues at the point of sale and beyond;

u. Whether Whirlpool failed to warn consumers of the Defect at the point of sale and beyond;

v.  Whether Whirlpool failed to warn consumers that its Class Dryers pose serious safety issues at the point of sale and beyond;

w.  Whether Whirlpool made fraudulent, false, deceptive, and/or misleading statements in connection with the sale of the Class Dryers at the point of sale and beyond;

x.  Whether Whirlpool was unjustly enriched by selling the Class Dryers;

y.  Whether Whirlpool should be ordered to disgorge all or part of the profits it received from the sale of the defective Class Dryers;

z.  Whether Plaintiffs and Class Members are entitled to damages, including compensatory, exemplary, and statutory damages, and the amount of such damages;

aa. Whether Plaintiffs and Class Members are entitled to replacement of their defective Dryers;

bb. Whether Plaintiffs and Class Members are entitled to equitable relief, including an injunction requiring that Whirlpool engage in a corrective notice campaign, retrofit program, and/or a recall; and

cc. Whether Plaintiffs and Class Members are entitled to an award of reasonable attorneys' fees, pre-judgment interest, post-judgment interest, and costs.

59. **Typicality.** Plaintiffs have substantially the same interest in this matter as all other members of the proposed Nationwide Class and Michigan Class they seek to represent, and Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members own or owned a clothes dryer designed and/or manufactured by Whirlpool with the uniform Defect that makes the Class Dryers immediately dangerous upon first use and cause the Dryers to fail within their expected useful lives and catch fire. All of the claims of Plaintiffs and Class Members arise out of Whirlpool's placement into the marketplace of a product it knew was defective and posed safety risks to consumers, and from Whirlpool's failure to disclose the known safety risks and Defect. Also common to Plaintiffs' and Class Members' claims is Whirlpool's conduct in designing, manufacturing, marketing, advertising, warranting and/or selling the defective Dryers, Whirlpool's conduct in concealing the Defect in the Dryers, and Plaintiffs' and Class Members' purchase of the defective Dryers.

60. **Adequacy of Representation**. Plaintiffs are committed to pursuing this action and have retained competent counsel experienced in products liability, deceptive trade practices, and class action litigation. Accordingly, Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the Classes. Plaintiffs' claims are coincident with, and not antagonistic to, those of other Class Members they seek to represent. Plaintiffs have no disabling conflicts

with the Class Members and will fairly and adequately represent the interests of the Class Members.

61.     **Superiority.**  A class action is superior to other available means for the fair and efficient adjudication of this dispute.  The injury suffered by each class member, while meaningful on an individual basis, is not of such magnitude as to make the prosecution of individual actions against Whirlpool economically feasible.  Even if Class Members themselves could afford such individualized litigation, the court system could not.  In addition to the burden and expense of managing many actions arising from the defective dryers, individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.   By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

62.     In the alternative, the proposed Classes may be certified because:

a.      the prosecution of separate actions by the individual members of the proposed class would create a risk of inconsistent adjudications, which could establish incompatible standards of conduct for Whirlpool;

b.      the prosecution of individual actions could result in adjudications, which  as a practical matter, would be dispositive of the interests of

non-party Class Members or which would substantially impair their ability to protect their interests; and

      c.    Whirlpool has acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final and injunctive relief with respect to the members of the proposed class as a whole.

## VII.   TOLLING OF STATUTES OF LIMITATIONS

63.  **Discovery Rule.**  Plaintiffs' claims accrued upon discovery their Class Dryer was defective in that dryers of this type are manufactured in a way that causes spontaneous fires which, in turn, results in costly repairs.  While Whirlpool knew and concealed at the point of sale the fact that Class Dryers share a defect that causes spontaneous fires, Plaintiff and Class Members could not and did not discover this fact through reasonable diligent investigation until after they experienced such spontaneous fire.  Plaintiff and Class Members who experienced dryer fires also could not know that these dryers presented the same danger of spontaneously catching fire.

64.  **Active Concealment Tolling.**  Any statutes of limitations are tolled by Whirlpool's knowing and active concealment of the fact that the Class Dryers suffered from an inherent defect.  Whirlpool kept Plaintiff and all Class Members ignorant of vital information essential to the pursuit of their claims, without any fault or lack of diligence on the part of Plaintiff.

65.    The details of Whirlpool's efforts to conceal at the point of sale its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members, and await discovery.  Plaintiffs and Class Members could not reasonably have discovered the fact that the Class Dryers were defective and that such dryers could spontaneously catch fire.

66.    **Estoppel**.  Whirlpool was and is under a continuous duty to disclose to Plaintiffs and all Class Members the true character, quality, and nature of the Class Dryers.   At all relevant times, and continuing to this day, Whirlpool knowingly, affirmatively, and actively misrepresented and concealed the true character, quality, and nature of the Class Dryers.  The details of Whirlpool's efforts to conceal its above-described unlawful conduct are in its possession, custody, and control, to the exclusion of Plaintiffs and Class Members, and await discovery.   Plaintiffs reasonably relied upon Whirlpool's affirmative misrepresentations and knowing, affirmative, and/or active concealment.  Based on the foregoing, Whirlpool is estopped from relying upon any statutes of limitation in defense of this action.

67.    **Equitable Tolling**.  Whirlpool took active steps to conceal the fact that it wrongfully, improperly, illegally, and repeatedly manufactured, marketed, distributed, sold, and/or leased Class Dryer that are defective.  The details of Whirlpool's efforts to conceal its above-described unlawful conduct are in its

possession, custody, and control, to the exclusion of Plaintiffs and Class Members, and await discovery.  When Plaintiffs learned about this material information, they exercised due diligence by thoroughly investigating the situation, retaining counsel, and pursuing their claims.  Whirlpool fraudulently concealed its above-described wrongful acts. Should it be necessary to assert, therefore, all applicable statutes of limitation are tolled under the doctrine of equitable tolling.

## VIII.   CLAIMS FOR RELIEF

## COUNT I

## Declaratory Relief

(Plaintiffs, Individually, and on Behalf of the Nationwide Class and,

Alternatively, the Michigan Class)

68.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs as is if fully set forth herein.

69.    There is a controversy between Whirlpool and proposed Class Members concerning the existence of the Defect in the Dryers.

70.    Pursuant to 28 U.S.C. § 2201, this Court  may "declare the rights and legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

71.    Accordingly, Plaintiffs and Class Members seek a declaration that the Dryers have the common Defect alleged herein in their design and/or manufacture.

72.     Additionally, Plaintiffs and Class Members seek a declaration that this common Defect found in the Dryers poses serious safety risks to consumers and the public.

## COUNT II

## Unjust Enrichment

(Plaintiffs, Individually, and on Behalf of the Nationwide Class and, Alternatively, the Michigan Class)

73.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

74.     As described above, Whirlpool sold the Dryers to Plaintiffs and Class Members even though those dryers were defective.  Whirlpool failed to disclose the Defect at the point of sale or otherwise.

75.     Whirlpool unjustly charges Plaintiffs and Class Members for repairs and/or replacement of the defective Dryers without disclosing that the Defect is widespread, and repairs do not address the root cause of the Defect.

76.     Whirlpool unjustly refused to repair or recall the Dryers in spite of the Defect that it has long known about and, instead (at most) told consumers that they need to hire a professional to disassemble and clean out the Dryers on a periodic basis at consumer's own cost or by their own hand even though Whirlpool knows this "instruction" is totally ineffective.

77.     As a result of its acts and omissions related to the Defect, Whirlpool obtained monies that rightfully belong to Plaintiffs and Class Members.

78.     Whirlpool appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiffs and Class Members who, without knowledge of the Defect, paid a higher price for their Dryers than those Dryers were worth. Whirlpool also received monies for those Dryers that Plaintiffs and Class Members would not have otherwise purchased. The Plaintiffs and Class Members did not receive the benefit of their bargain.

79.     Whirlpool's retention of these wrongfully-acquired profits violates fundamental principles of justice, equity, and good conscience.

80.     Plaintiffs and Class Member seek restitution from Whirlpool and an order proportionally disgorging all profits, benefits, and compensation obtained by Whirlpool from its wrongful conduct and establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

## COUNT III

### Negligence

(Plaintiffs, Individually, and on Behalf of the Nationwide Class)

81.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

46

82.    Whirlpool owed a duty to Plaintiffs and Class Members to design, manufacture, produce, test, inspect, market, distribute, and sell Dryers with reasonable care and in a workmanlike fashion, and had a duty to protect Plaintiffs and Class Members from foreseeable and unreasonable risks of harm.

83.    Whirlpool breached that duty by, among other things, defectively designing, manufacturing, testing, inspecting, and distributing the Dryers.

84.    As set forth more fully above, Whirlpool knew or should have known that the Dryers it designed, manufactured, produced, tested, inspected, marketed, distributed, and sold, when used in an ordinary and foreseeable manner, create an unreasonable safety risk and fail to perform as intended.

85.    Whirlpool knew or should have known that the Dryers create unreasonable safety risks as the Dryers have the Defect that causes them to catch fire, which fire spreads outside the Dryer cabinet.

86.    Whirlpool knew or should have known that the Dryers have the Defect that can cause catastrophic personal injury or death and property damage.

87.    Based on this knowledge, Whirlpool had a duty to disclose to the Plaintiffs and Class Members the serious safety risks posted by the Dryers and a duty to disclose the defective nature of the Dryers at the point of sale and beyond. Because of Whirlpool's conduct Plaintiffs and Class Members did not receive the

benefit of their bargain as they would have either not purchased a dryer with the safety defect or would have paid less for it than they did.

88.     Whirlpool had a further duty not to put defective Dryers on the market, and has a continuing duty to retrofit or replace its unsafe Dryers, remove its unsafe Dryers from the market, and recall the Dryers from consumers' homes.

89.     Whirlpool failed to exercise reasonable care with respect to design, manufacture, production, testing, inspection, marketing, distribution, and sale of the Dryers by, among other things, failing to design and manufacture the Dryers in a manner to ensure that, under normal intended usage, serious safety risks such as the ones posed by the Dryers did not occur.

90.     Whirlpool failed to exercise reasonable care because it failed to adequately and sufficiently inform users of its Dryers, either directly or indirectly, of the uniform Defect in the Dryers.

91.     Whirlpool failed to exercise reasonable care when it knew of the safety risks the Dryers pose and actively concealed those risks from Plaintiffs and Class Members.

92.     Whirlpool failed to exercise reasonable care when it failed to replace, repair, retrofit, or recall Dryers it knew or should have known were unsafe and defective.

93.     Whirlpool failed to exercise reasonable care when it did not conduct adequate testing, including pre-and post-marketing surveillance of the safety of the Dryers.

94.     As direct and proximate result of Whirlpool's negligence, Plaintiffs and Class Members bought the Dryers without the knowledge of the Defect or of its serious safety risks.

95.     As a direct and proximate result of Whirlpool's negligence, Plaintiffs and Class Members purchased unsafe products that could not and cannot be used for their intended use.

96.     As a direct and proximate result of Whirlpool's negligence, Plaintiffs and Class Members have suffered damages.

97.     Whirlpool was unjustly enriched by keeping the profits from the sales of the unsafe Dryers while never having to incur the cost of repair, replacement, or a recall.

98.     Whirlpool's negligence was a substantial factor in causing harm to Plaintiffs and Class Members and unjustly enriching Whirlpool.

## COUNT IV

### Breach of Implied Warranty of Merchantability

(Plaintiffs, Individually, and on Behalf of the Nationwide Class)

99.    Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

100.   The Dryers owned by Plaintiffs and Class Members were defectively designed and manufactured and pose serious and immediate safety risks to consumers and the public.

101.   The Dryers that left Whirlpool's facilities and control were manufactured according to defective designs.

102.   The Defect places consumers and the public at risk for their safety when the Dryers are used in consumers' homes.

103.   At all times relevant hereto, Whirlpool was under a duty imposed by law requiring that a manufacturer or seller's product be reasonably fit for the ordinary purposes for which the product is used and that the product be acceptable in trade for the product description.  This implied warranty of merchantability is part of the basis of the bargain between Whirlpool, on the one hand, and Plaintiffs and Class Members on the other.

104.   Notwithstanding the aforementioned duty, at the time of delivery, Whirlpool breached the implied warranty of merchantability in that the Dryers were defective and posed a serious risk at the time of sale, would not pass without objection, are not fit for the ordinary purposes for which such goods are used

50

(safely drying clothes/laundry in a residential setting), and failed to conform to the standard performance of like products used in the trade.

105.   Whirlpool knew or should have known that the Dryers pose a safety risk and are defective and knew or should have known that selling or leasing the Dryers to Plaintiffs and Class Members constituted a breach of the implied warranty of merchantability.

106.   As a direct and proximate of result of Whirlpool's breach of the implied warranty of merchantability, Plaintiffs and Class Members bought the Dryers without knowledge of the Defect or its serious safety risks.

107.   As a direct and proximate result of Whirlpool's breach of the implied warranty of merchantability, Plaintiffs and Class Members purchased unsafe products which could not be used for their intended purpose of safely drying clothes/laundry in a residential setting.

108.   As a direct and proximate result of Whirlpool's breach of the implied warranty of merchantability, Plaintiffs and Class Members have suffered damages in that Plaintiffs and Class Members did not receive the benefit of their bargain and would have either not purchased the defective product or would not have paid as much as they did.

109.   Whirlpool was unjustly enriched by keeping the profits for its unsafe products while never having to incur the cost of repair, replacement, retrofit, or a recall.

## COUNT V

## Breach of Express Warranty

(Plaintiffs, Individually, and on Behalf of the Nationwide Class)

110.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

111.   Whirlpool is and was at all relevant times a merchant with respect to clothes dryers.

112.   As fully pled, Whirlpool had knowledge of the Defect alleged herein and that it posed serious safety risks to consumer like Plaintiffs and Class Members.

113.   In its warranty to customers, Whirlpool warrants in writing that it will "pay for Factory Specified Parts and repair labor to correct defects in materials or workmanship that existed when this major appliance was purchased" within a year from the date of purchase.[3]

---

[3] *See* Exhibit 47, Plaintiff's "Whirlpool Cabrio Electronic Dryer Use and Care Guide," and page 15 thereof, "Whirlpool Corporation Laundry Warranty."

114.   The limited warranty of repair for the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and/or because Whirlpool has refused to provide remedies within a reasonable time.

115.   Whirlpool knew that the Dryers contained the Defect when it sold the appliances to Plaintiffs and Class Members.   Whirlpool breached its express warranty to correct defects in materials and workmanship that existed when the Dryers were purchased.   Defendant failed to do so despite knowledge of alternative designs, alternative materials, and/or options for retrofits.

116.   Whirlpool has not made repairs correcting such material Defect or component malfunctions in the Dryers.

117.   Further, any "repairs" Whirlpool offers do not fix the safety issues with the Dryers and are not adequate to fix the serious safety issues caused by the Defect.

118.   The limited warranty of repair for the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and/or because Whirlpool has refused to provide the promised remedies within a reasonable time.

119.   Also, as alleged in more detail herein, at the time Whirlpool warranted and sold the Dryers, it knew that the Dryers did not conform to the warranties and

were inherently defective, and Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Dryers.

120. Accordingly, Plaintiffs and Class Members are not limited to the limited warranty of "repair" and Plaintiffs and Class Members seek all remedies allowed by law.

121. As more fully detailed above, Whirlpool was notified of Plaintiffs' dryer fires but failed to provide defect-free dryers to Plaintiffs or Class Members free of charge or to provide adequate retrofit to remedy the Defect.

122. As more fully detailed above, Whirlpool was provided notice and has been on notice of the Defect and of its breach of its express written warranties through its own internal and external testing as well as consumer warranty claims reporting fires in the Dryers, customer complaints, and CPSC complaints, yet it failed to repair, replace or retrofit the Dryers to ensure they were free of defects in materials and workmanship.

123. As a direct and proximate result of Whirlpool's breach of its express warranty, Plaintiffs and Class Members have suffered damages including not receiving the benefit of their bargain and that they—Plaintiffs and Class Members— would have either not purchased the defective product or would not have paid as much as they did for their clothes dryers.  .

124.   Whirlpool has been unjustly enriched by keeping the profits from the sale of its unsafe Dryers while never having to incur the cost of repair, replacement, retrofit, or a recall.

## COUNT VI

## Injunctive Relief

(Plaintiffs, Individually, and on Behalf of the Nationwide Class and Michigan Class)

125.   Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

126.   Whirlpool designed, manufactured, produced, tested, inspected, marketed, distributed, and sold Dryers that contain material and dangerous Defect as described above.

127.   Based upon information and belief, Whirlpool continues to market, distribute, and sell the Dryers that contain the material and dangerous Defect and has done nothing to remove the Dryers containing the Defect described herein from the market and from the households of consumers.

128.   The Defect described herein poses an imminent threat to the safety of consumers and the public.

129.   Upon information and belief, Whirlpool has taken no corrective action concerning the Defect and has not issued any warnings or notices concerning the

dangerous Defect, replaced or retrofitted the dangerous Dryers, or implemented a product recall.

130.   Plaintiffs and Class Members have suffered actual damage or injury, are in immediate risk of suffering actual damage or injury due to the Dryers' Defect.

131.   Whirlpool should be required to take corrective action to avoid the serious and immediate safety risks its Dryers pose, including: issuing a nationwide recall and replacement and/or retrofit of the Dryers; issuing warnings and/or notices to consumers and Class Members concerning the Dryers' Defect and the safety risks the Dryers pose; and, if Whirlpool has not already done so, immediately discontinuing the manufacture, production, marketing, distribution, and sale of the defective Dryers.

## COUNT VII.

## Violations of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. 445.903, § *et seq.*

(Plaintiffs Individually and on Behalf of the Michigan Class)

132.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs as if fully set forth herein.

133.   Plaintiffs and the Michigan Class Members were "person[s]" within the meaning of the Mich. Comp Laws § 445.902(1)(d).

134.   At all relevant times, Whirlpool was a "person" engaged in "trade or commerce" within the meaning of Mich. Comp. Laws § 445.902(1)(d) and (g).

135.   The Michigan Consumer Protection Act ("Michigan CPA") applies to all claims of Plaintiffs and the Michigan Class because the conduct which constitutes violations of the code by Whirlpool occurred in the State of Michigan.

136.   Specifically, Section 903 of the Michigan CPA prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. . ." Mich. Comp. Laws § 445.903(1).   Whirlpool engaged in unfair, unconscionable, or deceptive methods, acts, or practices prohibited by the Michigan CPA, including: "(b) Using deceptive representations or deceptive designations of geographic origin in connection with goods or services."; "(c) Representing that goods or services have . . . characteristics. . . that they do not have. . ."; "(e) Representing that goods or services are of a particular standard. . . if they are of another."; "(g) Advertising or representing goods or services with intent not to dispose of those goods as advertised or represented."; "(s) Failing to reveal a material fact, the omission of which tends to  mislead or deceive the consumer and which fact could not reasonably be known by the consumer."; "(bb) Making a representation or statement of fact or statement of fact material to the transaction such that a person reasonably believes the represented state of affairs to be other than it actually is."; and "(cc) Failing to reveal facts that are material to the

transaction light of representations of fact made in a positive manner."   Mich.
Comp. Laws § 445.903(1)

137.   Whirlpool knew or should have known it was making representations
about the quality and durability of the Dryers by marketing and selling the Dryers.

138.   Whirlpool concealed, omitted, and failed to disclose the latent Defect.

139.   Whirlpool knew or should have known of the Defect at the time of
sale.

140.   Plaintiffs and the Michigan Class Members reasonably relied on
Whirlpool's misrepresentations and omissions of material facts when they
purchased or leased the Dyers. Further, facts surrounding the Defect could not
have been known to the consumer at the time of purchase because the symptoms of
the defect emerged months or years after the Dryers were in use.

141.   Plaintiffs and the Michigan Class Members suffered ascertainable loss
and actual damages as a direct and proximate result of Whirlpool's
misrepresentations and its concealment of and failure to disclose material
information.   Plaintiffs and the Michigan Class Members who purchased the
Dryers would not have purchased them at all and/or—if the Dryers' true nature had
been disclosed and mitigated—would have paid significantly less for them.
Plaintiffs and the Michigan Class Members also suffered diminished value of their

Dryers, as well as lost or diminished use. These Plaintiffs and Class Members have lost the benefit of their bargain.

142.   Whirlpool had an ongoing duty to all of its customers to refrain from unfair and deceptive practices under the Michigan CPA.  All owners of the Dryers suffered ascertainable loss in the form of diminished value of their Dryers as a result of Whirlpool's deceptive and unfair acts and practices made in the course of Whirlpool's business.

143.   Whirlpool's violations present an immediate and continuing risk to Plaintiffs as well as to the general public. Defendant's unfair acts and practices complained of herein significantly affect the public interest.

144.   As a direct and proximate result of Whirlpool's violations of the Michigan CPA, Plaintiffs and the Michigan Class have suffered injury-in-fact and/or actual damage.

145.   Plaintiffs seek injunctive relief to enjoin Whirlpool from continuing its unfair and deceptive acts; monetary relief against Whirlpool measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan Class Member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

146.   Plaintiffs also seek punitive damages against Whirlpool because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others.   Whirlpool intentionally and willfully misrepresented the safety and reliability of the Dryers and concealed material facts that only they knew.   Whirlpool's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT VIII

## Breach of Express Warranty, Mich. Comp. Laws §§ 440.2313 and 440.2860

(Plaintiffs, Individually, and on Behalf of the Michigan Class)

147.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein.

148.   Whirlpool is and was at all relevant times "merchant" with respect to appliances under Mich. Comp. Laws § 440.2104(1) and "seller" of appliances under Mich. Comp. Laws §440.2103(c).

149.   With respect to leases, Whirlpool is and was at all relevant times "lessor" of appliances under Mich. Comp. Laws § 440.2803(1)(p).

150.   The Dryers are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws § 440.2105(1) and 440.2803(1)(h).

151.   As fully pled, Whirlpool had knowledge of the Defect alleged herein and that it posed serious safety risks to consumer like Plaintiffs and Class Members.

152.   In its warranty to customers, Whirlpool warrants in writing that it will "pay for Factory Specified Parts and repair labor to correct defects in materials or workmanship that existed when this major appliance was purchased" within a year from the date of purchase.[4]

153.   The limited warranty of repair for the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Class Members whole and/or because Whirlpool has refused to provide remedies within a reasonable time.

154.   Whirlpool knew that the Dryers contained the Defect when it sold the appliances to Plaintiffs and Class Members.  Whirlpool breached its express warranty to correct defects in materials and workmanship that existed when the Dryers were purchased.  Defendant failed to do so despite knowledge of alternative designs, alternative materials, and/or options for retrofits.

155.   Whirlpool has not made repairs correcting such material Defect or component malfunctions in the Dryers.

---

[4] *See* Exhibit 47, Hirsts' "Whirlpool Cabrio Use and Care Guide" and page 15 "Whirlpool Corporation Laundry Warranty."

156.   Further, any "repairs" Whirlpool offers do not fix the safety issues with the Dryers and are not adequate to fix the serious safety issues caused by the Defect.

157.   The limited warranty of repair for the Dryers fails in its essential purpose because the contractual remedy is insufficient to make Plaintiffs and Michigan Class Members whole and/or because Whirlpool has refused to provide the promised remedies within a reasonable time.

158.   Also, as alleged in more detail herein, at the time Whirlpool warranted and sold the Dryers, it knew that the Dryers did not conform to the warranties and were inherently defective, and Defendant wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Dryers.

159.   Accordingly, Plaintiffs and Michigan Class Members are not limited to the limited warranty of "repair" and Plaintiffs and Michigan Class Members seek all remedies allowed by law.

160.   As more fully detailed above, Whirlpool was notified of Plaintiffs' dryer fires but failed to provide defect-free dryers to Plaintiffs or Michigan Class Members free of charge or to provide adequate retrofit to remedy the Defect.

161.   As more fully detailed above, Whirlpool was provided notice and has been on notice of the Defect and of its breach of its express written warranties through its own internal and external testing as well as consumer warranty claims

62

reporting fires in the Dryers, customer complaints, and CPSC complaints, yet it failed to repair, replace or retrofit the Dryers to ensure they were free of defects in materials and workmanship.

162.   Whirlpool's attempts to disclaim or limit its express warranties vis-à-vis consumers are unconscionable under the circumstances here.   Specifically, Whirlpool's warranty limitation in unenforceable because it knowingly sold a defective product without warning consumers.

163.   The warranty time limit is also unconscionable, because it fails to protect Plaintiffs and Michigan Class Members.   Among other things, Plaintiffs and the Michigan Class Members had no meaningful choice in determining these time limitations, the terms of which unreasonably favor Whirlpool.   A gross disparity in bargaining power existed between Whirlpool and Plaintiffs and Michigan Class Members, and Whirlpool knew or should have known that the Dryers were defective at the time of sale and would fail well before their useful life expectancy.

164.   Accordingly, recovery by Plaintiffs and other Michigan Class Members is not restricted to the limited warranty promising to repair and/or correct a manufacturing defect, and Plaintiffs, individually and on behalf of the other Michigan Class Members seek all remedies as allowed by law.

165.   Moreover, many of the injuries flowing from the Dryers cannot be resolved through the limited remedy of "repair", as many incidental and consequential damages have already been suffered because of Whirlpool's fraudulent conduct as alleged herein.

166.   Because of Whirlpool's breach of warranty as set forth herein, Plaintiffs and the other Michigan Class Members assert, as additional and/or alternative remedies, the revocation of acceptance of the Dryers and the return to Plaintiffs and the other Michigan Class Members the purchase price of their Dryers, and for such other incidental and consequential damages as allowed.

167.   As a direct and proximate result of Whirlpool's breach of its express warranty, Plaintiffs and Michigan Class Members have suffered damages in an amount to be determined at trial as they have lost the benefit of their bargain

## COUNT IX

## Breach of Implied Warranty of Merchantability, Mich. Comp. Laws §§440.2314 and 440.2860

(Plaintiffs Individually and on Behalf of the Michigan Class)

168.   Plaintiffs re-allege and incorporate by reference all preceding paragraphs as if fully set forth herein

169.   Whirlpool is and was at all relevant times a "merchant" with respect to appliances under Mich. Comp. Laws § 440.2104(1) and "seller" of appliances under § 440.2103(1)(d).

170.   With respect to leases, Whirlpool was and is at all relevant times "lessor" of appliances under Mich. Comp. Laws §440.2803(1)(p).

171.   The Dryers are and were at all relevant times "goods" within the meaning of Mich. Comp. Laws §440.2105(1) and 440.2803(1)(h).

172.   A warranty that the Dryers were in merchantable condition and fit for the ordinary purpose for which residential clothes dryers are used is implied by law pursuant to Mich. Comp. Laws  §§ 440.2314 and 440.2862.

173.   The Dryers, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which residential clothes dryers are used.  Thus, these Plaintiffs and Class Members have lost the benefit of their bargain in that that they would not have purchased the product if they had been advised it was not in merchantable condition or would have paid less for it

174.   Whirlpool was provided notice of these issues by, among other means: consumer contact (including Plaintiffs' calls), complaints posted on the CPSC website, and Whirlpool's notice and eventual recall of dryers sold in

England and Ireland that had the same defect of fires being caused by lint buildup coming in contact with the dryers' heating element.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court enter a judgment awarding the following relief:

A.    An Order certifying this action as a class action;

B.    An Order appointing Plaintiffs as class representatives and appointing undersigned counsel to represent the Classes;

C.    A Declaration that the Dryers are defective;

D.    A Declaration that the Defect poses a serious safety risk to consumers;

E.    An Order awarding injunctive relief by requiring Whirlpool to issue corrective actions including notification, recall, and replacement of the Dryers;

F.    Payment to the Classes of all damages associated with the replacement of the defective products, in an amount to be proven at trial;

G.    Payment to the Classes of all damages associated with property damage as a result of the defective products, in amount to be proven at trial;

H.    Restitution and other equitable relief, including disgorgement, as authorized by law;

I.      An award of attorneys' fees and costs, as provided by law and/or as would be reasonable from any recovery of monies recovered for or benefits bestowed on the Classes;

J.      Interest as provided by law, including but not limited to pre-judgment and post-judgment interest as provide by rule or statute; and

K.      Such other and further relief as this Court may deem just, equitable, or proper.

## X.    <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs respectfully request a trial by jury on all issues properly triable by jury.

DATED: June 26, 2017                    Respectfully submitted,

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, P.C.**
950 W. University Dr., Suite 300
Rochester, Michigan 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Mitchell M. Breit
(*pro hac vice* to be submitted)
Paul J. Hanly, Jr.
(*pro hac vice* to be submitted*)*
**SIMMONS HANLY CONROY**

**LLC**
112 Madison Avenue
New York, New York 10016-7416
Telephone: (212) 784-6400
Facsimile:  (212) 213-5949
mbreit@simmonsfirm.com
phanly@simmonsfirm.com

Gregory F. Coleman
(*pro hac vice* to be submitted)
Mark E. Silvey
(*pro hac vice to be submitted*)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, Tennessee 37929
Telephone:  (865) 247-0080
Facsimile:  (865) 533-0049
greg@gregcolemanlaw.com
mark@gregcolemanlaw.com

**Attorneys for Plaintiffs**